**Charles TOMBERLIN II, Plaintiff,**

v.

**Marnie CLARK, et al., Defendants.**

**No. 2:13–CV–1111–LSC.**

United States District Court,
N.D. Alabama,
Southern Division.

Feb. 19, 2014.

Thomas B. Albritton, Albrittons Clifton & Moody PC, Andalusia, AL, Kevin Hickey, Byars Hickey & Hall PLLC, Fort Smith, AK, for Plaintiff.

Aaron G. McLeod, Stephen A. Rowe, Adams & Reese LLP, Graham R. Pulvere, Jordan L. Lenger, Stephen E. Whitehead, Lloyd Gray Whitehead & Monroe PC, Birmingham, AL, Felicia M. Brooks, Joshua J. Lane, Sharon E. Ficquette, State of Alabama Department of Human Resources, Luther J. Strange, III, Office of the Attorney General, Emily C. Marks, Ball Ball Matthews & Novak PA, Montgomery, AL, Kimberly N. Kelley, Robert

V. Wood, Jr., Wilmer & Lee PA, Huntsville, AL, for Defendants.

## MEMORANDUM OF OPINION

### L. SCOTT COOGLER, District Judge.

This case has its origins in a divorce action that included an allegedly false accusation of child abuse. The alleged abuse was investigated by the Shelby County Department of Human Resources ("SCDHR"), but Plaintiff Charles Tomberlin ("Plaintiff") contends that no evidence of abuse ever existed. Through this action, Plaintiff seeks damages for violation of his constitutional rights. Before the Court are motions to dismiss filed by Defendants Michael Fetter ("Fetter"), Child & Adolescent Psychological Services of Inverness ("CAPS"), Julie O'Connor ("O'Connor"); Janee Dickinson ("Dickinson"), and Karol Beck("Beck").[1] For the reasons stated below, the motions of Dickinson and CAPS will be GRANTED in full, while those of all other Defendants will be GRANTED in part and DENIED in part.

## I. Background

### A. Facts Pleaded by the Plaintiff

Plaintiff and Clark were married on June 21, 2003, and divorced on December 16, 2010. The marriage produced one child, known for the purposes of this action as "ABT," who was five years old in 2012. In October of 2008, Clark filed an Ex Parte Petition seeking a Protection from Abuse Order ("PFA") against Plaintiff, alleging that he had committed domestic violence against her, threatened to use a gun against her, and said he would remove the child from town. Although the PFA Order was made permanent at a subse-

quent hearing, Plaintiff alleges that later court proceedings found Clark's allegations to be false.

According to Plaintiff, the PFA Petition was filed "as a calculated means of securing sole custody of the minor child...." (Doc. 1–63 at 3.) Clark filed for divorce three days later. Between December 2008 and February 2009, Plaintiff and Clark attended marriage counseling. Eventually, however, Plaintiff stopped attending counseling sessions, and Clark continued with individualized counseling with Waller at Wellspring. The divorce remained pending for a protracted period as the couple battled over custody.

Approximately one year after the PFA was filed, Clark made the allegation that Plaintiff had sexually abused ABT, which Plaintiff characterizes as false. Clark made these allegations to Waller, and either she or Waller reported the suspected abuse to ADHR and SCDHR. Clark apparently supported her allegations against Plaintiff by stating that ABT was exhibiting age-inappropriate sexual behavior during rest time at Clark's home.

Despite the PFA, Plaintiff had been able to see ABT regularly. After the allegation of sexual abuse were made in September 2009, his visitation was restricted to supervised visits for two hours per week. The allegations were investigated by SCDHR, with the case being originally assigned to Defendant Dickinson. ABT was evaluated at the CHIPS Clinic in September 2009. The evaluation found no signs of abuse. Dickinson informed Plaintiff of the CHIPS findings, allegedly stating that "there was no evidence to support the sexual abuse allegation." (*Id.* at 4.)

---

1. Three Defendants, Marnie Clark ("Clark"), Leah Waller ("Waller"), and Wellspring Christian Clinic, Inc. ("Wellspring"), answered the complaint and did not file a motion to dismiss. Three other Defendants, SCDHR, Alabama Department of Human Re-

sources ("ADHR"), and Nancy Buckner ("Buckner"), have already been dismissed from this action. Defendant Alisha Ruffin moved to dismiss for lack of proper service, but the Court denied the motion to dismiss and ordered her properly served.

Clark then had ABT's pediatrician test the child for sexually transmitted diseases. The tests were negative. When he learned of the testing, Plaintiff again contacted SCDHR and learned that ABT's case was now assigned to Alisha Ruffin. On May 8, 2010, SCDHR suspended Plaintiff's visitation with ABT pending the investigation. Two days later, SCDHR filed dependency and neglect allegations with the Shelby County Juvenile Court. A dependency hearing was held on August 10, 2010, at which the juvenile court determined that no dependency or emergency existed. Plaintiff characterizes this hearing as showing that "the evidence proved that the allegations were false." (*Id.* at 5.) The Juvenile Court judge sent the case back to the domestic relations division.

As part of its investigation, SCDHR contracted with Defendants Fetter and O'Connor, who are both child psychologists. Defendant Fetter, an employee of Defendant CAPS, was "contracted by SCDHR to evaluate ABT, make recommendations, and provide treatment to ABT, and testify on behalf of SCDHR and [ADHR]." (*Id.*) The investigation included seventeen interviews conducted by Defendant O'Connor. Plaintiff does not identify when these interviews occurred. (*Id.* at 6.)

Defendant Fetter also allegedly contacted "the judge"[2] by letter between August 10 and September 2, 2010. Plaintiff's visitation was again suspended on the latter date based on this letter. Supervised visitation was reinstated on September 22, 2010. (*Id.*)

On or about October 4, 2010, Plaintiff received a letter from SCDHR informing him that the Department had reason to believe that the allegations of sexual abuse were true. Plaintiff requested a review of this determination, and Defendant Beck conducted this review. Beck upheld the original determination, and in a letter to the Plaintiff dated December 2, 2010, stated that Plaintiff's name would be placed on the Alabama State Central Registry on Child Abuse and Neglect.

Plaintiff later brought a civil action in state court to expunge his name from the aforementioned registry. According to the Complaint, the Alabama Attorney General moved to continue the case on October 27, 2011, mandating the expungement of Plaintiff's name. Plaintiff was notified that his name had been removed on December 16, 2011.

B. Procedural History

Plaintiff originally filed this lawsuit in the United States District Court for the Middle District of Alabama on November 30, 2012. He brought claims against Clark, ADHR, SCDHR, Buckner, Waller, Wellspring, Beck, Dickinson, Ruffin, O'Connor, Fetter, and CAPS. Some Defendants filed answers in the Middle District, some filed Motions to Dismiss, and several joined in a motion to transfer venue. Judge Myron Thompson granted the latter motion. (Doc. 1–126.)

Since that time, Defendants ADHR, SCDHR, and Buckner have been dismissed.[3] The Amended Complaint con-

---

**2.** It is unclear whether the judge referred to as the recipient of Fetter's letter was the juvenile court judge who presided over the hearing on August 10, 2010 or a judge from the domestic relations division, to which Plaintiff states the presiding judge returned the case after the hearing.

**3.** Judge Thompson denied these Defendants' Motion to Dismiss but ordered Plaintiff to file an amended complaint. This complaint stated no claims against ADHR, SCDHR, and Buckner, but they were not formally dismissed by the Middle District. Therefore, this Court entered a show cause order as to why these Defendants should not be dismissed.

tains claims against all Defendants except ADHR, SCDHR, and Buckner. (Doc. 1–63.) Count I asserts due process claims under the Constitution against Wellspring, Waller, CAPS, Fetter, Dickinson, Ruffin, O'Connor, and Beck. Count II makes the same claims under the Alabama Constitution. Count III states claims against Dickinson and Ruffin under Art. I, § 35 of the Alabama Constitution. Count IV seems to bring the same due process claims asserted in Count I, this time under 42 U.S.C. § 1983. In addition, Plaintiff maintains that the same Defendants named in Count I also violated his constitutional right "to have a relationship with his daughter." (Doc. 1–63 at 22.) The Court will read Count I as a procedural due process claim, and Count IV as a substantive due process claim.

In Count V, Plaintiff brings a claim for defamation against Clark, and in Count VI a negligence claim against Fetter, CAPS, Dickinson, Ruffin, O'Connor, Waller, and Wellspring. Count VII sets out an abuse of process claim against Clark and Count VIII a malicious prosecution claim against Clark, Waller, Dickinson, Beck, and Wellspring. Finally, Count IX asserts an intentional infliction of emotional distress claim against Clark. Plaintiff makes no request for injunctive relief but seeks both compensatory and punitive damages against all Defendants.

## III. Standards of Review

### A. Rule 12(b)(1)

Some Defendants invoke the sovereign immunity of the state of Alabama and move to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). Alabama's constitution spells out the state's sovereign immunity in Art. I, § 14. The concept of a

state's sovereign immunity was recognized in the Eleventh Amendment to the U.S. Constitution and federal courts have long applied it to bar cases against unconsenting states. *See Hans v. Louisiana,* 134 U.S. 1, 10–11, 10 S.Ct. 504, 33 L.Ed. 842 (1890) (applying sovereign immunity to bar citizen's suit against his home state). Dismissal pursuant to sovereign immunity is jurisdictional and should be analyzed under the framework of Rule 12(b)(1). *Bennett v. United States,* 102 F.3d 486, 488 n. 1 (11th Cir.1996)

Motions to dismiss under Rule 12(b)(1) may take the form of either a facial or a factual attack. *Scarfo v. Ginsberg,* 175 F.3d 957, 960 (11th Cir.1999). Under a facial attack, the allegations in the complaint are taken as true for the purposes of the motion. *Sea Vessel, Inc. v. Reyes,* 23 F.3d 345, 347 (11th Cir.1994). A factual challenge, on the other hand, questions the existence of subject matter jurisdiction based on matters outside the pleadings. *Lawrence v. Dunbar,* 919 F.2d 1525, 1529 (11th Cir.1990). Under a factual challenge, the Court may hear conflicting evidence and decide the factual issues that determine jurisdiction. *Colonial Pipeline Co. v. Collins,* 921 F.2d 1237, 1243 (11th Cir.1991).

### B. Rule 12(b)(6)

Some defendants have moved to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Such a motion is due to be granted if the Plaintiff has failed to state a claim upon which relief may be granted. Fed. R. Civ. Proc. 12(b)(6). "When considering a motion to dismiss, all facts set forth in the plaintiff's complaint 'are to be accepted as true and the court limits its

Plaintiff did not respond, and the three Defendants were formally dismissed on December 11, 2013. (Doc. 24.)

consideration to the pleadings and exhibits attached thereto.' " *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000) (quoting *GSW, Inc. v. Long County*, 999 F.2d 1508, 1510 (11th Cir.1993)). Furthermore, all "reasonable inferences" are to be drawn in favor of the plaintiff. *St. George v. Pinellas County*, 285 F.3d 1334, 1337 (11th Cir.2002).

Nonetheless, the plaintiff must plead "enough facts to state a claim that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).[4] "Unsupported conclusions of law or of mixed fact and law have long been recognized not to prevent a Rule 12(b)(6) dismissal." *Dalrymple v. Reno*, 334 F.3d 991, 996 (11th Cir.2003) (quoting *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1036 n. 16 (11th Cir.2001)). The Federal Rules of Civil Procedure require a pleading that states a claim to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. Proc. 8(a)(2). If the facts in the pleading "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief,' " and the complaint must be dismissed. *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

The Eleventh Circuit has adopted a "two-pronged approach" to motions to dismiss: "1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.' " *American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir.2010) (quoting *Iqbal*, 556 U.S. at 664, 129 S.Ct. 1937). In evaluating whether a claim is plausible, "courts may infer from the factual allegations in the complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Id.* at 1295 (quoting *Iqbal*, 556 U.S. at 682, 129 S.Ct. 1937).

■ Using this framework, the Court takes care not to "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79, 129 S.Ct. 1937. However, a plaintiff need not prove his case in the complaint; "the plausibility standard 'calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence' of the defendant's liability." *Chaparro v. Carnival Corp.* 693 F.3d 1333, 1338 (11th Cir.2012) (quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). Further, a complaint should not be dismissed unless the allegations do not support any plausible theory of relief. *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir.1997).

C. Qualified Immunity

■ The affirmative defense of qualified immunity has also been raised. The Supreme Court has stressed that qualified immunity represents an immunity from suit rather than a defense to liability, and that it should therefore be addressed in

---

**4.** In *Twombly*, the U.S. Supreme Court abrogated the oft-cited standard that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief" set forth in *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *Twombly*, 550 U.S. at 560–63, 127 S.Ct. 1955. The Supreme Court stated that the "no set of facts" standard "is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 563, 127 S.Ct. 1955.

the earliest possible stage of a case. *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). When the Defendant acts within his official discretion, qualified immunity serves to dismiss a claim at its initial stage if the Court concludes from the face of the complaint that the law supporting the claim was not clearly established before the Defendant acted. *Marsh v. Butler Cnty., Ala.,* 268 F.3d 1014, 1023 (11th Cir.2001). In addressing a motion to dismiss on qualified immunity, the Court may begin by addressing either the existence of a constitutional violation or the question of whether the right being violated has been "clearly established." *Pearson v. Callahan,* 555 U.S. 223, 235–35, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

## IV. DISCUSSION

### A. Immunity

Several Defendants claim to be immune from suit regarding the claims in this action. Defendants Dickinson and Beck raise three forms of immunity: sovereign immunity with respect to claims against them in their official capacities, qualified immunity with respect to federal claims against them in their individual capacities, and state agent immunity with respect to the state law claims against them. Defendant Fetter raises testimonial immunity with respect to the negligence claim against him.

### 1. Sovereign Immunity

 Defendants Dickinson and Beck assert that any claim against them in their official capacities is barred by the doctrine of sovereign immunity. It is without question that the Eleventh Amendment to the U.S. Constitution prohibits suits for damages against a state by citizens of that or another state, absent a waiver by that state. *See Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). The principles of sovereign immunity are also embedded in Art. I, § 14 of the Alabama Constitution, which states "[t]hat the State of Alabama shall never be made a defendant in any court of law or equity." Ala. Const. Art. 1, § 14. These principles bar any claim in this suit against Dickinson and Beck in their official capacities. Dickinson and Beck work for SCDHR and ADHR respectively, with both agencies being arms of the state for the purpose of sovereign immunity. *See e.g., Ex parte Mobile County Dept. of Human Res.,* 815 So.2d 527, 530 (Ala.2001); *Mitchell v. Davis,* 598 So.2d 801, 806 (Ala. 1992).

 Plaintiff does not dispute that ADHR and SCDHR are arms of the state or that the state normally enjoys sovereign immunity. He argues, however, that the Alabama legislature has waived such immunity through several statutes that require particular state and local officials and agencies to purchase bonds. *See* Ala. Code § 11–2–1; §§ 36–5–2 to –4; § 36–5–18. It is unclear to this Court whether any of these statutes actually require a bond for any Defendants in this case. More importantly, under Art. I, § 14 of the Alabama Constitution, the state legislature simply does not have the power to waive Alabama's sovereign immunity, through a bond statute or in any other manner. *Haley v. Barbour Cnty.,* 885 So.2d 783, 788 (Ala.2004) ("if an action is an action against the state within the meaning of § 14, such a case 'presents a question of subject-matter jurisdiction, which cannot be waived or conferred by consent.'") (quoting *Patterson v. Gladwin Corp.,* 835 So.2d 137, 142–43 (Ala.2002)).

Alabama's sovereign immunity under its own constitution is absolute and cannot be waived. Ala. Const., Art. I, § 14. Because the state legislature cannot waive this immunity or consent to suit, Plaintiff's argument that it did so by passing bonding

statutes must fail. *See Haley*, 885 So.2d at 788. Beck and Dickinson are officials of the state, and suits against them in their official capacities are barred by sovereign immunity. *Ex parte Alabama Department of Mental Health and Retardation*, 937 So.2d 1018, 1023 (Ala.2006) ("a complaint seeking money damages against a State employee in his or her official capacity is considered a complaint against the State, and such a complaint is barred"). Therefore, all claims against Beck and Dickinson in their official capacities are due to be dismissed.

### 2. Qualified Immunity

 Beck and Dickinson also assert that they are entitled to qualified immunity. State and local officials are entitled to qualified immunity if they act within the discretion of their office and their conduct does not violate clearly established constitutional law. *Harlow v. Fitzgerald*, 457 U.S. 800, 817–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The Court thus asks three questions: 1) were the officials acting within their discretion; 2) did a constitutional violation occur; and, if so, 3) was that violation unlawful under clearly established law? In its discretion, this Court is free to consider whether the right at issue was clearly established before addressing the existence of a violation. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

 Dickinson and Beck assert that they acted within their discretionary authority during all relevant time periods. The burden to prove this point is on the officials asserting immunity. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir.2004). In the qualified immunity context, a discretionary function simply means one that falls within the employee's job responsibilities. *Id.* The Court asks whether the employee was pursuing a job related goal through authorized means. *Hill v. Dekalb Reg'l Youth*

*Det. Ctr.*, 40 F.3d 1176, 1185 (11th Cir. 1994). In *Harbert Int'l, Inc. v. James*, the Eleventh Circuit explained that the question is not whether the official has the authority to violate constitutional rights. 157 F.3d 1271, 1282 (11th Cir.1998). In place of that " 'untenable' tautology," the Court should ask whether the action complained of is reasonably related to the official's normal duties. *Id.* (quoting *Sims v. Metropolitan Dade Cnty.*, 972 F.2d 1230, 1236 (11th Cir.1992)). For example, in *Jordan v. Doe*, U.S. Marshals were alleged to have transported the Plaintiff to jails where they knew unconstitutional conditions existed. 38 F.3d 1559, 1561 (11th Cir.1994). The Court asked not whether the marshals had the authority to place Plaintiff in such conditions but simply whether transporting and delivering prisoners fell within their normal duties. *Id.* at 1566.

 Thus framed, this inquiry clearly reveals that Dickinson and Beck acted within their discretionary authority when dealing with Plaintiff's case. Defendant Dickinson, an investigator with SCDHR, was assigned to investigate the allegations against Plaintiff. From the information in the complaint, she does not appear to have come to an ultimate conclusion about Plaintiff's case before it was reassigned to Defendant Ruffin. However, any decision to continue investigating Plaintiff, or about how to investigate the claims against him, fell within Dickinson's normal duties. This is true even if those decisions were made with suspicion or even actual knowledge that no abuse had occurred. The same can be said for the actions of Defendant Beck, who was tasked with performing an administrative review of DHR's decision to place Plaintiff's name of the Child Abuse and Neglect registry. Such an action clearly fell within the scope of her authori-

ty, even if her final decision was contrary to the evidence before her.

 Since Dickinson and Beck were acting within the scope of their discretionary authority, the Court must next determine whether their actions constituted a violation of clearly established constitutional law. A violation of Plaintiff's constitutional rights might exist where state actors continued to investigate him and caused changes to his parental rights after they knew that abuse was unlikely to have occurred. *See infra*, Part IVE. However, the Court finds that such a violation has not been clearly established. In order for a right to be clearly established, precedent cases from the U.S. Supreme Court, the Eleventh Circuit, or the highest court in the state must give a reasonable official fair warning that her conduct violates the law. *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). *Hope* abrogated the Eleventh Circuit's previous standard requiring almost identical facts to show clearly established law. However, it remains true that the clearly established test does not apply at a high level of generality, but rather in a more particularized sense. *Id.* at 741–42, 122 S.Ct. 2508; *see also Anderson v. Creighton*, 483 U.S. 635, 639–40, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

In other words, it is not enough that the Supreme Court has articulated a general right to familial integrity or parenting. *See Anderson*, 483 U.S. at 640, 107 S.Ct. 3034 (explaining that a general right to be free from searches without probable cause does not answer the question of whether a violation of that right is clearly established in a particular case). In this case, Dickinson and Beck would have to know that a sloppy or overzealous investigation (or review of an investigation) constituted a violation of that right. Plaintiff has not cited this Court to any case that would have provided Dickinson and Beck with this

knowledge. The Court can find no case in the U.S. Supreme Court, the Eleventh Circuit, or the Alabama Supreme Court that would have informed a reasonable official that the conduct Plaintiff complains of violated the constitution. Therefore, qualified immunity is applicable, and Plaintiff's federal claims against Dickinson and Beck must be dismissed.

### 3. State–Agent Immunity

 Defendants Dickinson and Beck also claim that the state-law claims against them are barred by state-agent immunity. State agents are immune from civil liability when the decisions complained of are administrative in nature, when the agent is discharging duties imposed on an agency by statute, rule or regulation, and when the agent is exercising judgment in enforcing criminal law, releasing prisoners or persons of unsound mind, or educating students. *Ex parte Cranman*, 792 So.2d 392, 405 (Ala.2000). A state agent is not immune, however, "when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Id.*

 The Alabama Supreme court has established a burden-shifting process governing the assertion of state-agent immunity. First, the state agent bears the burden of showing that she was engaged in a function that gives rise to state-agent immunity. *Giambrone v. Douglas*, 874 So.2d 1046, 1052 (Ala.2003). Once she has done so, the burden shifts to the plaintiff to show that the agent "acted wilfully, maliciously, fraudulently, in bad faith or beyond his or her authority." *Ex parte Watson*, 37 So.3d 752, 758 (Ala.2009) (citing *Ex parte Reynolds*, 946 So.2d 450, 452 (Ala. 2006)). The actions (and job descriptions) of Dickinson and Beck differ enough to require the Court to analyze each of their actions separately.

### a. Dickinson

Dickinson's job at SCDHR involved investigating claims of child abuse. The Complaint identifies her as the initial investigator and alleges that she told Plaintiff that there appeared to be no evidence of abuse on December 10, 2009. Dickinson was later replaced as the investigator by Alisha Ruffin. The Complaint suggests that this occurred prior to February of 2010, when Plaintiff learned of certain STD tests performed on his daughter and "requested a meeting with Alisha Ruffin to discuss the case." (Doc. 1–63 at 5.)

In order to meet her burden of showing that she was engaged in an immunized function, Dickinson argues in her brief that she was "discharging a duty imposed by DHR to investigate the case." (Doc. 14 at 10). The relevant inquiry, however, is not whether a state agency imposed a particular duty on its employee but rather whether that duty was "imposed on a department or agency by statute, rule, or regulation." *Cranman*, 792 So.2d at 405. *Cranman* also requires that "the statute, rule, or regulation prescribes the manner for performing the duties and the state agent performs in that manner." *Id.*

Here, there is a statute that imposes a duty of investigation upon DHR. Ala.Code § 26–14–6.1 (stating that reports of child abuse in schools or state operated facilities shall be investigated by law enforcement, but "[a]ll other reports of suspected child abuse and neglect shall be investigated by the Department of Human Resources.") A statute also prescribes the manner in which DHR should investigate, including listed goals for the investigation and a description of potential methods of investigating. Ala.Code § 26–14–7.

At this stage of the litigation, the Court need not determine whether Dickinson followed the statutory prescription meticulously, because Plaintiff has not alleged that Dickinson did anything outside of the parameters for investigation established by Ala.Code § 26–14–7. Nor has he met his burden of showing that Dickinson acted willfully, maliciously, in bad faith, or beyond the scope of her authority. *See Watson*, 37 So.3d at 758. According to Plaintiff's own timeline, Dickinson only participated in the case for about two months between December of 2009 and February of 2010. Plaintiff does not allege that Dickinson had reason to know the allegations were false during this short period, nor does he allege that any damages occurred during this period. Accordingly, Dickinson is entitled to state agent immunity. As such, Plaintiff's state law claims against her are due to be dismissed.

### b. Beck

Defendant Beck works for ADHR as an "Administrative Record Reviewer." At Plaintiff's request, Beck reviewed the finding of indicated child abuse made by SCDHR. According to Plaintiff's complaint, Beck's review finalized the finding and placed Plaintiff's name on the Child Abuse and Neglect Registry. Although Ala. Code § 26–14–8 requires ADHR to establish and oversee such a statewide registry, there does not appear to be any statute in the Alabama Code giving ADHR a duty to conduct the type of review that Beck engaged in. Therefore, she cannot claim state-agent immunity under the same prong of the *Cranman* analysis that applies to Defendant Dickinson. *See* 792 So.2d at 405.

However, another aspect of *Cranman's* rule may be applicable to the present case. It provides that a state agent shall be immune when "exercising his or her judgment in . . . making administrative adjudications." *Id.* The Court directs the parties to brief the issue of whether Beck's review of Tomberlin's file constituted an adminis-

trative adjudication. In addition to the question of whether an administrative adjudication occurred, the parties should focus on the scope of Beck's review, and the legal standard the Court should use to determine whether she exceeded that scope or acted in bad faith. The specific timetable of this briefing will be set forth in the order entered herewith.

### 4. Testimonial Immunity

Defendant Fetter argues that the state-law negligence claims are barred by testimonial immunity because Fetter was essentially hired by SCDHR as an expert witness in ABT's dependency case. The Court notes, however, that some of the actions complained of occurred after the case in which he testified had been resolved. The only hearing in the dependency case appears to have been held on August 10, 2010, and the Judge found no basis for the dependency. Plaintiff alleges that Fetter was appointed ABT's psychologist in December of 2010, and that Fetter recommended a neutral party in July of 2011 and the use of a parent coordinator in January of 2012. Logically, the absolute immunity of a witness cannot continue to shield him from liability for actions taken after the trial at which he testified has ended.

Witnesses, however, do enjoy absolute immunity from any claim based on their testimony during a trial or other court proceeding. *Rehberg v. Paulk,* —— U.S. ——, 132 S.Ct. 1497, 1505, 182 L.Ed.2d 593 (2012); *Jones v. Cannon,* 174 F.3d 1271, 1281 (11th Cir.1999). Thus, even if a witness's testimony was perjured or malicious, he enjoys absolute immunity from any civil claim based upon it. *Jones,* 174 F.3d at 1288. This immunity is based on the fundamental need for witnesses to participate candidly in the Court's factfinding mission without fear of personal liability. *Id.* Testimonial immunity attaches to Fetter's testimony at the dependency hearing in August of 2010.

Under Alabama law, testimonial immunity also attaches to the letter that Fetter sent to the judge who presided over the dependency hearing. *O'Barr v. Feist,* 292 Ala. 440, 296 So.2d 152, 156–57 (1974) (finding absolute immunity where psychologist wrote letter to judge overseeing commitment proceeding). In addition, the *O'Barr* court made it clear that a witness could not be liable for any damage caused by the decision of a court, because the judge (or jury if there is one) remains the final decision maker. *Id.* Plaintiff, however, contends that he was harmed not only by Fetter's recommendations to the judge but by the manner of his investigation, which took place outside the courtroom. Such an investigation is not fully protected by a witness's testimonial immunity. *See Jones v. Cannon,* 174 F.3d 1271, 1290 (11th Cir.1999) (finding claims of constitutional violations during pre-indictment investigation not barred by testimonial immunity) (citing *Buckley v. Fitzsimmons,* 509 U.S. 259, 276, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993)). From the face of the complaint, the Court cannot conclude that every aspect of Fetter's investigation should be shielded from liability based on testimonial immunity.

### B. Statute of Limitations

All claims against Defendant Dickinson have been dismissed based on the immunities discussion in Part IVA. The remaining four defendants with pending motions to dismiss all assert that the claims against them are barred by the applicable statute of limitations. For the reasons discussed below, all four are mistaken.

The statute of limitations for claims brought under § 1983 is the same as that for personal injury tort claims in the state where Plaintiff brings suit; in

Alabama that limitations period is two years. *Powell v. Thomas,* 643 F.3d 1300, 1303 (11th Cir.2011). The limitations period for the state law claims of negligence and malicious prosecution is also two years. Ala.Code § 6–2–38(*l*), (h).

▮ "Dismissal under Federal Rule of Civil Procedure 12(b)(6) on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred." *Tello v. Dean Witter Reynolds, Inc.,* 410 F.3d 1275, 1288 (11th Cir.2005) (internal quotations removed). *See also Omar ex rel. Cannon v. Lindsey,* 334 F.3d 1246, 1251 (11th Cir.2003) (concluding that resolving the statute of limitations issue at the motion to dismiss stage "would be premature").

The two year statute of limitations cannot bar claims against Defendants Fetter and Beck. Plaintiff's allegations against Defendant Fetter include his appointment as ABT's child psychologist in mid-December 2010, as well as his recommendation of a neutral party in July of 2011 and the use of a parent coordinator in January 2012. The allegations against Defendant Beck center around her review of the investigation and decision to place Plaintiff's name on the registry. This decision was finalized with a letter dated December 2, 2010. Therefore, both Beck and Fetter committed at least some of the complained of acts after November 30, 2010, meaning that this suit, filed November 30, 2012, fell within the statute of limitations.

▮ The Complaint alleges that Dr. O'Connor participated in the DHR investigation that culminated in the placement of Plaintiff's name on the Child Abuse and Neglect Registry in December of 2010. Although Plaintiff's complaint specifically alleges the number of interviews O'Connor conducted, it does not state on its face when these interviews took place. Thus, without addressing exactly when the cause of action against O'Connor accrued, the Court must conclude that dismissal based on the statute of limitations would be premature and inappropriate.

**C. The Federal Due Process Claims**

Plaintiff alleges that he was deprived of liberty and property without due process of law. He makes these claims under the Due Process Clauses of the Fifth and Fourteenth Amendments as well as under 42 U.S.C. § 1983. Because the Fifth Amendment applies only to the actions of the Federal Government, Plaintiff's claims under that amendment are due to be dismissed because he has not alleged that any Defendant is a federal government actor. *See* U.S. Const. amend. V. The Fourteenth Amendment, on the other hand, applies to actions by the states. U.S. Const. amend. XIV § 1. There are two types of constitutional protection provided by the due process clause of the Fourteenth Amendment, procedural due process and substantive due process. *McKinney v. Pate,* 20 F.3d 1550, 1555 (11th Cir.1994) (citing *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990)).

As discussed earlier, Plaintiff's federal constitutional claims against Dickinson and Beck in their official capacities are barred by sovereign immunity, while those against the same Defendants in their individual capacities are barred by qualified immunity. Federal due process claims of both procedural and substantive varieties against Defendants Fetter, CAPS, and O'Connor remain to be addressed.

**1. Claims Against CAPS**

▮ CAPS is a private entity that employed Defendant Fetter. In certain situations, private corporations may be state actors for the purposes of § 1983. *Ancata v. Prison Health Servs., Inc.,* 769 F.2d 700, 703 (11th Cir.1985). CAPS cannot be liable to Plaintiff on a theory of

respondeat superior. *See Harvey v. Harvey,* 949 F.2d 1127, 1129 (11th Cir.1992) (extending Supreme Court precedent concerning vicarious liability of municipal corporations to private entities) (citing *Monell v. Department of Social Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Like a governmental entity, a corporation may be liable under § 1983 only when the corporation itself causes the constitutional injury. *See Grech v. Clayton Cnty., Ga.,* 335 F.3d 1326, 1329 (11th Cir.2003).

To survive a motion to dismiss, Plaintiff must allege that some "policy" or "custom" of the corporation caused the deprivation. *Monell,* 436 U.S. at 690–91, 98 S.Ct. 2018. This allegation must reveal either the existence of an official policy or a custom or practice of the corporation "shown through the repeated acts of a final policymaker." *Grech,* 335 F.3d at 1329 (citing *Monell,* 436 U.S. at 690–91, 694, 98 S.Ct. 2018).

■■■ Plaintiff does not allege either the existence of an official policy or a custom shown by repeated acts. Instead Plaintiff states only the conclusion that CAPS has a policy that "allows its employees ... to violate Plaintiff's constitutional right to due process by permitting their employees unlimited discretion...." (Doc. 1–63 at 13.) Essentially, Plaintiff is not alleging a policy, but the lack of a policy. The Complaint makes this clear on the next page when it states that CAPS does not have any "rules regulations, or procedures to prevent employees or agents from violating the constitutional rights of citizens...." (Id. at 14.) Where no specific, official policy is alleged, the § 1983 plaintiff cannot simply assert that there should be a policy; he must show that a custom exists. *See Sewell v. Town of Lake Hamilton,* 117 F.3d 488, 489 (11th Cir.1997). Although Plaintiff baldly states that a custom of allowing agents to investigate false claims exists, he provides no factual sup-

port for the idea that this custom exists. Instead of showing "the repeated acts of a final policymaker," he provides only facts about his own case. *Grech,* 335 F.3d at 1329. As such, he fails to state a claim against CAPS, whose motion to dismiss is due to be granted.

### 2. The Procedural Due Process Claim

■■■ "In this circuit, a § 1983 claim alleging a denial of procedural due process requires proof of three elements: 1) a deprivation of a constitutionally-protected liberty or property interest; 2) state action; and 3) constitutionally-inadequate process." *Grayden v. Rhodes,* 345 F.3d 1225, 1232 (11th Cir.2003). The first element requires the Court to determine whether the plaintiff has pleaded both the existence of a constitutionally-protected interest and a deprivation of such an interest. *Arrington v. Helms,* 438 F.3d 1336, 1348 (11th Cir.2006). Parents have a fundamental liberty interest in the "care, custody, and control of their children." *Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (describing this right as "perhaps the oldest of the fundamental liberty interests recognized by this Court.") (citing *Meyer v. Nebraska,* 262 U.S. 390, 399–401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)).

■■■ Plaintiff has pleaded that ABT is his child, but that Defendant Clark "has custody of ABT and [Plaintiff] has supervised visitation." (Doc. 1–63 at 2.) Regardless, a noncustodial natural parent may have a protected liberty interest in the relationship with his child. *Hodgson v. Minnesota,* 497 U.S. 417, 446, 110 S.Ct. 2926, 111 L.Ed.2d 344 (1990) (Stevens, J., concurring) (citing, inter alia, *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (holding that unwed father was entitled to hearing before his child could be removed)). In *Hodgson,*

Justice Stevens noted that "a demonstration of commitment to the child through the assumption of personal, financial, or custodial responsibility" could give the parent such an interest. *Hodgson,* 497 U.S. at 446, 110 S.Ct. 2926. Plaintiff pleads both personal and financial relationships with his daughter. Plaintiff has demonstrated for this motion the existence of a constitutionally protected interest.

■ Plaintiff must also show that he was deprived of this protected liberty interest. Plaintiff's Complaint reveals that his visitation with his daughter was restricted beginning in September of 2009 and that it was suspended entirely between May and August of 2010 and between September 2 and September 22, 2010. Plaintiff also alleges that his visitation times with his daughter remain supervised. These are plausible deprivations of Plaintiff's right to the "care, custody, and control" of his child. *Troxel,* 530 U.S. at 65, 120 S.Ct. 2054.

Plaintiff also pleads that this deprivation occurred, at least in part, due to the conduct of Fetter and O'Connor. According to Plaintiff, Fetter and O'Connor continued the investigation after they should have known that no abuse had actually occurred. For example, Fetter wrote his letter to the judge after the August 10, 2010, hearing at which Plaintiff alleges that the Court found that there was no evidence of abuse. In addition, he continued to recommend intervention by costly third parties, such as parent coordinators, after both the juvenile court and the divorce court had rejected the idea that any abuse had occurred. The allegations against O'Connor are less detailed, but Plaintiff plausibly alleges that, in interviewing ABT seventeen times, she pressed the child to say things long after she knew that any abuse was unlikely. At this stage in the litigation Plaintiff has alleged the plausible deprivation of a constitutional right.

■ Plaintiff must next allege facts demonstrating that Fetter and O'Connor acted under color of state law.[5] Each of these Defendants appear to work as private psychologists, but SCDHR contracted with them for the specific purpose of evaluating and treating ABT, and for Fetter to testify on behalf of SCDHR and ADHR. (Doc 1–63 at 6.) A physician contracted by the state may be acting under color of state law. *West v. Atkins,* 487 U.S. 42, 54–55, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *see also Farrow v. West,* 320 F.3d 1235, n. 3 (11th Cir.2003). A private individual or business entity can act under color of state law in one of three ways. First, it could exercise some power or perform some function that is normally reserved exclusively for the state. *Blum v. Yaretsky,* 457 U.S. 991, 1005, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). Secondly, the private individual or entity could be a joint participant with the state in some enterprise. *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 724–25, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). Finally, the private party could act in concert with or at the direction of a state entity. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150–152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

Private entities with state contracts could ultimately be found to have performed functions that are the prerogative of the state. *See Ancata v. Prison Health Servs., Inc.,* 769 F.2d 700 (11th Cir.1985).

**5.** Technically, the inquiry required by the "state action" element of *Grayden* can be distinguished from the "under color of state law" requirement found in 42 U.S.C. § 1983, and both requirements must be met in order to state a due process violation. This Court finds, however, that in this particular case, the inquiries are similar enough that both are satisfied by the same type of evidence and reasoning.

Alternatively, an individual or entity that has a contract with a state agency to perform particular services can be said to be acting at the direction of a state entity. The investigation of child abuse and child welfare claims is traditionally the prerogative of the state, and Plaintiff's complaint asserts that Fetter and O'Connor performed these services. Likewise, Plaintiff alleges that SCDHR directed Fetter and O'Connor to perform an investigation and treatment of ABT.

██ The final element that Plaintiff must allege in a procedural due process claim is that the process was constitutionally inadequate. *Grayden*, 345 F.3d at 1232. Due process is often said to require "notice and an opportunity to be heard." *Reams v. Irvin*, 561 F.3d 1258, 1263 (11th Cir.2009). More specifically, the Due Process Clause generally requires a meaningful hearing prior to the deprivation of life, liberty, or property. *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Cryder v. Oxendine*, 24 F.3d 175, 177 (11th Cir.1994). However, in cases in which a pre-deprivation remedy is impracticable, due process may be satisfied by a post-deprivation remedy. *Reams*, 561 F.3d at 1264.

██ In this case, Plaintiff alleges a number of plausible deprivations but fails to identify what process is constitutionally inadequate. Plaintiff cannot argue that the false statements of Fetter and other witnesses biased the family court proceedings to the extent that he failed to receive a meaningful hearing because he won at the dependency hearing when the judge found no evidence of abuse. In his brief, Plaintiff states that he complains not of the results of the investigation but of the process involved in the investigation itself. (Doc. 11 at 15.) He argues that this inves-

tigation "took place wholly outside the walls of the courthouse" and deprived Plaintiff of his constitutional rights. (*Id.*)

To plead this element of a procedural due process claim, Plaintiff must show that a deprivation occurred either without process or with process that was constitutionally inadequate. Here, SCDHR apparently learned of the alleged abuse from Defendant Waller on or about September 1, 2009. Then, ABT was evaluated for sexual abuse at the CHIPS clinic. Even though the examination failed to show evidence of abuse, Plaintiff's visitation was restricted on September 11, 2009.[6] Plaintiff apparently did not know of the allegations and investigation until November 12, 2009. Even if his visitation was restricted without notice and an opportunity to be heard on September 11, 2009, Plaintiff does not allege that Fetter or O'Connor had anything to do with that deprivation. Rather, Fetter's earliest involvement, as evidenced by the facts in Plaintiff's complaint, occurred in May of 2010, and O'Connor's seems to have begun during that same period. (Doc. 1–63 at 12.)

Plaintiff does allege, however, that Fetter's recommendation caused him to lose visitation between May of 2010 and the dependency hearing in August of 2010. Again it could be argued this suspension of visitation rights occurred without notice or an opportunity to be heard, because the first hearing in Plaintiff's case did not take place until August of 2010. The decision to suspend visitation, however, seems to have been made by SCDHR, not by Fetter or O'Connor. Even if these psychologists acted with knowledge that no abuse had occurred, they had no personal responsibility to secure a hearing. As state actors, they may be responsible for substantive due process violations (see Part IV(C)(3)),

---

**6.** Plaintiff does not state what entity restricted the visitation or what role in this particular

restriction was played by any of the Defendants.

but the facts of the Complaint do not make out a plausible claim that either Fetter or O'Connor played a role in the denial of a hearing or other fair procedure to Plaintiff.

■ Additionally, even if the failure of pre-deprivation remedies would violate procedural due process, "procedural due process violations do not become complete 'unless and until the state refuses to provide due process.'" *McKinney v. Pate*, 20 F.3d 1550, 1562 (11th Cir.1994) (citing *Zinermon v. Burch*, 494 U.S. 113, 126, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990)). Courts have recognized that child abuse investigations can involve situations in which pre-deprivation hearings are impracticable, and the state can act to protect children without violating due process. *Doe v. Kearney*, 329 F.3d 1286, 1294 (11th Cir. 2003). Plaintiff does not allege that a pre-deprivation hearing should have occurred, either before his visitation was limited in September of 2009 or before it was suspended in May of 2010. Nor does he assert that Fetter or O'Connor had any role in denying him such a hearing.

Furthermore, Plaintiff's complaint reveals that he was afforded several opportunities to challenge any procedural deprivations, including at the dependency hearing, in the divorce proceedings, and in the suit he brought to remove his name from the Child Abuse and Neglect registry. Plaintiff does not challenge the adequacy of these post-deprivation remedies in curing the alleged procedural deficiencies. Such inadequacy would be necessary for Plaintiff to make out a plausible violation of procedural due process. *See Cotton v. Jackson*, 216 F.3d 1328, 1331 (11th Cir. 2000); *Bell v. City of Demopolis, Ala.*, 86 F.3d 191, 192 (11th Cir.1996). Therefore, Plaintiff's procedural due process claims against Fetter and O'Connor are due to be dismissed.

### 3. The Substantive Due Process Claims

■ Like procedural due process claims, substantive due process claims require action under color of state law and a constitutional deprivation. *McKinney*, 20 F.3d at 1556. As noted in Part IV(C)(2), Plaintiff has plausibly alleged that Fetter and O'Connor are state actors. To implicate substantive due process, however, Plaintiff must allege a violation of a right that is "fundamental" or "implicit in the concept of ordered liberty." *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937). Plaintiff pleaded that the Defendant's actions deprived him both of property, in the form of money, and of liberty, in the form of his relationship with his daughter. The Supreme Court has made it clear that the rights of parents in the upbringing of their children are fundamental, and are protected by the substantive aspect of the Due Process Clause. *Meyer*, 262 U.S. at 399–401, 43 S.Ct. 625; *Troxel*, 530 U.S. at 71–73, 120 S.Ct. 2054.

■■ This does not mean, however, that every complaint alleging governmental interference with a family relationship states a valid due process claim. *See Michael H. v. Gerald D.*, 491 U.S. 110, 121, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989). Plaintiff's constitutional rights as a parent do "not include a constitutional right to be free from child abuse investigations." *Foy v. Holston*, 94 F.3d 1528, 1536–37 (11th Cir.1996) (quoting *Watterson v. Page*, 987 F.2d 1, 8 (1st Cir.1993)). The Eleventh Circuit has not addressed the situation where it is alleged that state actors continued this type of investigation in the face of either knowledge or strong evidence that the allegations were false. The *Foy* court, however, recognized that "[v]iolations of the right to family association are determined by a balancing of competing interests." *Id.*

■ Here, Plaintiff demonstrates that multiple Courts found allegations made by Clark to be false, including those made in support of her PFA Petition, before the abuse investigation began. (Doc. 1–63 at 3.) He also alleges that the investigation continued, and Fetter and O'Connor participated in it, after the dependency hearing at which "the juvenile court judge determined that there was no emergency or dependency; rather the evidence proved that the allegations were false." (*Id.* at 5.) In addition, Plaintiff pleads that the Divorce Court's final decree, issued in the same month that Fetter officially became ABT's treating psychologist, stated that "[t]here is no factual basis from which the Court can find that any inappropriate sexual conduct occurred." (*Id.* at 7.) Finally, the Alabama Attorney General enabled Plaintiff's name to be removed from the Child Abuse and Neglect registry. (*Id.*)

The Third Circuit has created a test for determining whether state officials violate parents' rights in child abuse investigations. *See Croft v. Westmoreland Cnty. Children and Youth Servs.*, 103 F.3d 1123, 1126 (3rd Cir.1997) (holding that "a state has no interest in protecting children from their parents unless it has some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger"). The *Croft* court focused on whether the information available to state actors would have reasonably created enough suspicion of abuse to justify interfering with the parents' rights. *Id.* (finding no justification where suspicion rested entirely on anonymous tip). The Third Circuit concluded that when the state actor lacked objective evidence, her actions interfering with parental rights were an "arbitrary abuse of government power." *Id.* at 1127.

It is not clear that the Eleventh Circuit would adopt the Third Circuit's balancing test, particularly since it could be read to require probable cause or even to go beyond that standard and require the state actor to have specific kinds of evidence. *Id.* at 1126. Regardless, this Court is not prepared to go so far. Here, however, Plaintiff alleges not only that Defendants lacked evidence of abuse, but that they knew or should have known that the allegations were false. The type of inquiry necessary to determine whether and when each Defendant had a reasonable belief that the abuse occurred simply cannot be done in the context of this motion to dismiss. Plaintiff has alleged a plausible constitutional deprivation that can support a substantive due process claim against Fetter and O'Connor.

### D. State Law Claims
#### 1. Claims under the Alabama Constitution

■ Count II alleges violations of Alabama's version of the due process clause. Ala. Const. Art. I, § 6. Count III alleges violations of the "objective of government" clause found in Article I, § 35 of the Alabama Constitution. These claims fail because the Alabama constitution does not create a private right of action to sue for monetary damages. *Matthews v. Ala. Agric. & Mech. Univ.*, 787 So.2d 691, 698 (Ala.2000) *accord Ross v. Alabama*, 893 F.Supp. 1545, 1555 (M.D.Ala.1995). A claim for equitable relief or mandamus may be maintained under the Alabama Constitution, but Plaintiff brings no such claims here. *See Todd v. Ingram*, 277 Ala. 305, 308–09, 169 So.2d 424 (Ala.1964); *Ex parte Weeks*, 611 So.2d 259, 262 (Ala.1992). Therefore, all of Plaintiff's claims in Counts II and III are due to be dismissed.

#### 2. Negligence Claims

■ As demonstrated in the discussion of immunity in Part IVA, Plaintiff retains his negligence claims against Defendants

Fetter, CAPS (which may be liable here under a respondeat superior theory), O'Connor, and Beck. These negligence claims stem from the manner in which the investigation and (in the case of Beck) the review of the investigation were conducted. They are premised on the idea that these parties either continued the investigation or affirmed it while disregarding or negligently misunderstanding evidence that no abuse had occurred, including the findings of multiple courts. Plaintiff states a plausible claim for negligence against all of these defendants.

The only defense to this claim raised by Defendant O'Connor at this juncture is the statute of limitations, which, as discussed in Part IV B, does not bar the claim against her. Fetter and CAPS raise the idea of testimonial immunity (see Part IV(A)(3)). To the extent that any claims rely on Fetter's actual testimony, they must be dismissed, but many of the actions complained of against Fetter took place outside the courtroom or after the conclusion of the case in which he testified.

■ Fetter also briefly raises the issue of duty, arguing that Fetter and CAPS cannot be liable to Plaintiff because he was never their patient. However, a medical provider in Alabama may be sued outside the Alabama Medical Liability Act by third parties who were never patients. *Taylor v. Smith*, 892 So.2d 887, 892–93 (Ala.2004). In *Taylor*, a third-party motorist sued a doctor who prescribed methadone to a woman who consistently tested positive for other drugs. *Id.* at 890. The Alabama Supreme Court found that the doctor had a duty to third party motorists based on the foreseeability that his treatment of the patient might cause harm to them. *Id.* at 891–92. Here, Fetter may also have a duty to Plaintiff, a non-patient, based on the foreseeability that his treatment of Plaintiff's daughter could harm Plaintiff's relationship with her.

Defendant Beck raised several affirmative defenses, including state-agent immunity, res judicata, unclean hands, and the Rooker–Feldman doctrine. As noted in Part IV(A)(2)(b), the Court has deferred decision on the application of state-agent immunity to the negligence claim against Beck. Thus, it will not herein address these defenses.

3. Malicious Prosecution Claims

■ Plaintiff brought claims of malicious prosecution against Clark, Waller, Dickinson, Ruffin, Beck and Wellspring. Only the claim against Beck is before the Court at this time. Beck claims that Plaintiff fails to state a claim for malicious prosecution against her. This Court agrees.

■ In order to state a claim for malicious prosecution, a plaintiff must allege the following elements: "(1) that the present defendant instituted a prior judicial proceeding against the plaintiff; (2) that in instituting the prior proceeding the present defendant acted without probable cause and with malice; (3) that the prior proceeding ended in favor of the present plaintiff; and (4) that the present plaintiff was damaged as a result of the prior proceeding." *Wal–Mart Stores Inc. v. Goodman*, 789 So.2d 166, 174 (Ala. 2000). Plaintiff fails to allege multiple elements necessary for malicious prosecution. Even if Beck's review of the Plaintiff's record is a judicial proceeding, which seems unlikely, Beck did not actually institute it. The Complaint reveals, rather, that Plaintiff requested a review of his case, thus "instituting" the review.

Furthermore, the review was not a proceeding that ended in favor of the Plaintiff, since Beck upheld the SCDHR's finding that abuse was indicated. The Complaint reveals two possible judicial proceedings that terminated in Plaintiff's favor. The first is the dependency proceeding, which

was instituted by SCDHR long before Beck's involvement. The second is the lawsuit to remove Plaintiff's name from the registry, which was instituted by Plaintiff himself. Thus Plaintiff makes no plausible allegation that Beck maliciously prosecuted any proceeding against him, and this claim is due to be dismissed.

V. Conclusion

Defendants Fetter, CAPS, O'Connor, Dickinson and Beck moved to dismiss all claims against them. The motions to dismiss by Defendants Fetter and O'Connor are due to be GRANTED with respect to the procedural due process claim and the claims brought under the Alabama Constitution. They are due to be DENIED with respect to the substantive due process and negligence claims. Defendant CAPS's motion is due to be DENIED with respect to the negligence claim and GRANTED with respect to all other claims. Defendant Dickinson's motion is due to be GRANTED with respect to all claims against her. Defendant Beck's motion to dismiss is due to be DENIED with respect to the negligence claim against her. It is due to be GRANTED with respect to all other claims. A separate order reflecting this memorandum of opinion will be entered.

### ORDER

In accordance with the Memorandum of Opinion entered herewith, the Court takes the following actions on pending motions to dismiss by Defendants Michael Fetter ("Fetter"), Child and Adolescent Psychological Services of Inverness ("CAPS"), Julie O'Connor ("O'Connor"), Janie Dickinson ("Dickinson") and Karol Beck ("Beck"). The motions by Defendants Fetter and O'Connor are GRANTED with respect to the procedural due process claim and the claims brought under the Alabama Constitution. The same motions are DENIED with respect to the substantive due process and negligence claims.

Defendant CAPS's motion is DENIED with respect to the negligence claim and GRANTED with respect to all other claims. Defendant Dickinson's motion is GRANTED with respect to all claims against her.

Defendant Beck's motion is GRANTED with respect to all claims but the negligence claim. The Court orders the parties to brief the issue as referenced in Part 4(A)(3)(b). Defendant Beck has until Friday, February 28, 2014 to file a brief of no more than ten (10) pages. Plaintiff may then respond with a brief of no more than ten (10) pages by Monday, March 10, 2014. Defendant may then file a reply brief of no more than five (5) pages by March 17, 2014. All briefs must be double spaced in fourteen (14) point type, but footnotes may be in 12 point type.